Case 1:17-cv-00203 Document 335 Filed on 02/12/21 in TXSD Page 1 of 8

United States District Court
Southern District of Texas
**ENTERED**
February 12, 2021
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CONSOLIDATED

| | | |
|---|---|---|
| IN THE MATTER OF THE COMPLAINT OF PARAGON ASSET COMPANY LTD, AS OWNER OF THE DRILLSHIP DPDS1, | § § § § | |
| | § | CIVIL ACTION NO. 1:17-CV-203 |
| V. | § | |
| | § | In Admiralty |
| GULF COPPER & MANUFACTURING CORPORATION, *et al.*, | § § § | |

*******

| | | |
|---|---|---|
| SIGNET MARITIME CORPORATION, AS OWNER OF THE TUG SIGNET ENTERPRISE, ITS ENGINES, TACKLE, ETC., IN A CAUSE OF EXONERATION FROM OR LIMITATION OF LIABILITY, | § § § § § § | CIVIL ACTION NO. 1:17-CV-247 |

*******

| | | |
|---|---|---|
| SIGNET MARITIME CORPORATION, AS OWNER OF THE TUG SIGNET ARCTURUS, ITS ENGINES, TACKLE, ETC., IN A CAUSE OF EXONERATION FROM OR LIMITATION OF LIABILITY. | § § § § § § § | CIVIL ACTION NO. 1:18-CV-035 |

**MEMORANDUM OPINION**

Paragon Asset Company Ltd filed this limitation of liability action after its drillship DPDS1 unmoored during Hurricane Harvey and allided with other vessels and structures. (Doc. 1) Paragon moved for partial summary judgment, arguing that at that time of the incident, the DPDS1 was a "vessel" under 1 U.S.C. § 3 for purposes of the Limitation of Shipowners' Liability Act, 46 U.S.C. § 30505. (Motion, Doc. 236) The Court granted the Motion. (Order, Doc. 302) In this Memorandum Opinion, the Court provides the reasons supporting that decision.

**I.     Summary Judgment Evidence**

The drillship DPDS1 was constructed in 1979, and over the next three decades, different

owners kept the vessel well maintained. (Vessel Details, Doc. 236-2, 2; Schenkel Depo., Doc. 236-4, 7—8) In 2008, the owner at the time fully refurbished the drillship at an estimated cost of $350—500 million. (Schenkel Depo., Doc. 236-4, 7; Yester Depo., Doc. 236-3, 9) Two years later, the DPDS1 was "as good as you could get" with "all new this, and all new that", aside from an old hull. (Yester Depo., Doc. 236-3, 6, 9) Around this time, Noble Drilling (U.S.) LLC or one of its subsidiaries acquired the DPDS1. (Schenkel Depo., Doc. 236-4, 6) At the time, Paragon formed part of the Noble corporate family.

In 2012, Noble invested another $100—150 million for additional upgrades, including adding thrusters. (Yester Depo., Doc. 236-3, 10; Schenkel Depo., Doc. 236-4, 7) Two years later, when the DPDS1 was deployed off the coast of Brazil, Paragon was severed from Noble and became the owner of the drillship.

In 2015, due to poor market conditions, Paragon moved the drillship to Port Arthur, removing two of its thrusters before the journey. (Yester Depo., Doc. 236-3, 10—11) The drillship had no commercial working ventures from this point on. (Yester Depo., Doc. 236-3, 10—11) Between 2015 and 2017, the DPDS1 remained "cold stacked", with no maintenance and no running equipment. (Schenkel Depo., 259-2, 8) As a result, the DPDS1 deteriorated. (*Id.*)

At Port Arthur, no permanent crew remained onboard the DPDS1, but a mooring crew and Paragon employees visited the drillship daily. (Yester Depo., Doc. 236-3, 3) Paragon maintained navigational aids on the structure, including battery-operated lights. (Schenkel Depo., Doc. 236-4, 14) As the DPDS1 always remained afloat, Paragon installed a RigStat GPS system. (*Id.* at 3) During this time, Paragon transferred moveable inventory to other ships, including the drill pipe, drill collars, and extra motors. (Yester Depo., Doc. 236-3, 11—12)

In early 2017, Paragon received notice that the DPDS1 could no longer dock at Port Arthur, because the dock owners planned to convert the area to a terminal. (Schenkel Depo., Doc. 259-2, 9—10) In May 2017, Paragon had the DPDS1 towed from Port Arthur to the Gulf Copper dock

near Corpus Christi. (Yester Depo., Doc. 236-3, 10—11) During this time, Paragon searched, without success, for someone to purchase the DPDS1, perhaps as a floating marine vessel. (Schenkel Depo., Doc. 259-2, 8—9) But by mid-2017, with no purchaser in sight, and taking into account the maintenance status of the structure, it became "more and more likely" that the DPDS1 "was bound to be scrapped". (*Id.*)

Between May 2017 and the arrival of Hurricane Harvey in August, the DPDS1 remained "fully outfitted" with cranes, wenches, and electrical generators, and it possessed rudders, mooring bits for towing, bilge systems for buoyancy, a GPS tracking system, and navigational lights. (Yester Depo., Doc. 236-3, 12; Schenkel Depo., Doc. 236-4, 17) A two-man maintenance crew remained onboard to secure the drillship, and others boarded the ship "as needed", including to replace monitoring equipment that did not work well. (Yester Depo., Doc. 259-3, 6) The engineering and physical integrity of the drillship remained sufficient to allow it to be towed out of port or to sea; in other words, the DPDS1 was safe to use for towage. (Schenkel Depo., Doc. 236-4, 15)

In August 2017, Hurricane Harvey struck the Corpus Christi area, affecting the Gulf Copper dock. Paragon originally planned to tow the DPDS1 offshore. (*Id.* at 9) In preparation for the tow, Paragon sought DNV certification, which requires that a fully independent surveyor determine the seaworthiness of the structure. (*Id.* at 9–10, 13) The contracted surveyor focused on DPDS1's "water integrity", visually observing the stability of the drillship from the outside and walking through the drillship to check doors and watertight bulkheads. (Schenkel Depo., Doc. 236-4, 12) Following the inspection, the DPDS1 received DNV certification, confirming that the structure remained seaworthy. (*Id.* at 13)

During Hurricane Harvey, the DPDS1 unmoored from its dock and allided with other structures. After the storm, although damaged, the DPDS1 could still float safely. (*Id.* at 9, 16) Surveyors examined the DPDS1 after the hurricane and considered it safe for towing back to the

Gulf Copper dock. (*Id.* at 9)  Paragon then arranged for the DPDS1 to be towed to Brownsville. (*Id.* at 16)  Component pieces remained onboard, and though the hurricane rendered some equipment hazardous, Paragon stowed or sea-fastened that equipment onto the DPDS1 for its voyage. (*Id.*)  In October 2017, Paragon successfully towed the DPDS1 to the Port of Brownsville, where it was eventually scrapped.

## II.     Analysis

### A.  Applicable Standard

Partial summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, shows that no genuine dispute of material fact exists, and that the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a); *Woodard v. Jones,* 247 Fed. Appx. 494, 495 (5th Cir. 2007) (per curiam).  A genuine dispute over material facts exists if the evidence presents an issue "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party", and the fact at issue might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248, 250 (1986).  The moving party "bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact."  *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).  All facts and inferences drawn from those facts must be viewed in the light most favorable to the nonmovant.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

If the movant provides such evidence, the burden shifts to the responding party to present affirmative evidence to defeat the motion.  *Anderson,* 477 U.S. at 257.  "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment."  *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003).  In considering a motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record."  FED. R. CIV. P. 56(c)(3).

### B. Applicable Definition of "Vessel"

"The Limitation of Shipowners' Liability Act allows a vessel owner to limit its liability in certain actions for damages to the value of the vessel (and pending freight) on which the incident giving rise to the litigation occurred." *In re Eckstein Marine Service L.L.C.*, 672 F.3d 310, 314 (5th Cir. 2012) (citing 46 U.S.C. § 30501, *et seq*.). For an owner to receive the statutory protection, the structure involved in the incident must be a "vessel". *See id*. The Supreme Court has instructed that for purposes of the Limitation of Shipowners' Liability Act, 1 U.S.C. § 3 provides the applicable definition for "vessel", which "includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3; *see also In re S. Recycling, L.L.C.*, 982 F.3d 374, 382—83 (5th Cir. 2020) (citing *Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 489 (2005)). A structure qualifies as a vessel if "a reasonable observer, looking to the [structure's] physical characteristics and activities, would consider it designed to a practical degree for carrying people or things over water." *Id*. at 383 (quoting *Lozman v. City of Riviera Beach, Fla.*, 568 U.S. 115, 133 (2013)). "Courts should 'avoid subjective elements, such as owner's intent,' and should consider only 'objective evidence of a waterborne transportation purpose.'" *Id*.

Courts deem a structure a "dead ship" and not a vessel if it has "been withdrawn from navigation and maritime commerce." *Id*. (quoting *Amoco Oil v. M/V Montclair,* 766 F.2d 473, 477 (11th Cir. 1985)). "Whether a vessel has been withdrawn from navigation is a question of the physical characteristics of and modifications to the structure." *Id*. (citing THOMAS J. SCHOENBAUM, 1 ADMIRALTY & MAR. L. § 3:6 (6th ed. 2018) ("Only if a ship is so changed in function that it has no further navigation function will it be considered to have lost vessel status.")). "[A] limitation on what a vessel can do does not necessarily render it a dead ship." *Id*. at 385.

*In re Southern Recycling* illustrates well the application of the reasonable observer test

and highlights the importance of avoiding consideration of the owner's subjective intent for the structure at issue. Southern Recycling purchased an articulated tug/barge unit that included an oceangoing tanker barge, the DBL 134. Southern Recycling transported the DBL 134 (and accompanying tugboat) to a Texas shipyard for shipbreaking and recycling. After the DBL 134 arrived at the shipyard, a contractor began preliminary shipbreaking activities, including making cuts to the bow of the barge. An explosion occurred aboard the barge, killing one individual and injuring others, and leading to the admiralty action. The district court dismissed the action for lack of subject matter jurisdiction, concluding that the DBL 134 was a "dead ship" at the time of the accident.

On appeal, the Fifth Circuit explained that when the DBL 134 arrived at the shipyard, it satisfied the definition for a "vessel", even though Southern Recycling at the time fully intended to scrap the barge. *Id*. at 383. The Fifth Circuit confirmed that the subjective intent to dismantle the barge was insufficient to render it a dead ship, as Southern Recycling's decision to remove the DBL 134 from commerce did not in itself impact any physical attributes or behavior of the structure. *Id*. (quoting *Blake Marine Grp., LLC v. Epic Ala. Recyclers, LLC*, No. 19-0468-CG-B at *4 (S.D. Ala. Dec. 30, 2019)). By the time of the accident, however, a contractor had made structural changes to the barge, including cutting "a gaping hole open to the sea down to or below [DBL 134's] waterline". *Id*. Although the DBL 134 still floated, the alterations would lead a reasonable observer to see "a severed bow and part of a raked hull—with a gaping hole in it." *Id*. at 385. "A reasonable observer would not see a vessel ready to transport persons or cargo, but a dead ship in the process of being scrapped." *Id*. Based on this analysis, the Fifth Circuit affirmed the district court's finding that the DBL 134 constituted a dead ship when the accident occurred.

### C. The Status of the DPDS1 at the time of Hurricane Harvey

The summary judgment record demonstrates that at the time that Hurricane Harvey struck Corpus Christi, the DPDS1 remained capable of carrying people or things over water, and

that a reasonable observer would conclude as much based on the DPDS1's physical characteristics and activities. A two-man maintenance crew remained onboard, and other personnel regularly visited the ship. The structure maintained its rudders, mooring bits, bilge systems, GPS tracking system, and navigational lights. Had a purchaser been found, the DPDS1 could have been fitted with a crane to serve as an oceangoing water vessel. In addition, three months before the incident, the DPDS1 successfully carried equipment over water—albeit while being towed. Also, days before Hurricane Harvey hit, an independent surveyor inspected the DPDS1 and deemed it seaworthy for towage. Even after the hurricane damaged the DPDS1, the structure remained afloat, and Paragon successfully towed the drillship with equipment onboard back to Corpus Christi. Based on these physical characteristics and activities, a reasonable observer would see a vessel ready to transport persons or cargo.

      Signet fails to controvert this evidence, submitting no evidence that creates a fact issue as to whether a reasonable observer would conclude that the DPDS1, at the time of Hurricane Harvey, remained capable of carrying people or things over water. Signet highlights that no permanent crew remained aboard the structure, and that it had deteriorated in the years before the hurricane. Accepting these points as true, they still fail to raise a fact issue. The applicable definition does not require that a "vessel" maintain a permanent crew. The evidence shows that a small maintenance team remained onboard the DPDS1, and other personnel visited the drillship, including to replace equipment. A reasonable observer would have witnessed the maintenance crew aboard the DPDS1, strengthening the perception that the DPDS1 remained a functional structure. And while the DPDS1 suffered deterioration between 2015 and 2017, Signet points to no specific physical defect that would lead a reasonable observer to question whether the drillship could carry people or things over water. Paragon had removed some equipment from the structure, but even a limitation on activities does not render a structure a "dead ship". *See S. Recycling,* 982 F.3d at 383.

Signet also places weight on Paragon's intent to scrap the vessel. (Response, Doc. 259, 7, 11) But the Fifth Circuit's decision in *In re Southern Recycling* dispenses with this argument. In that case, it was undisputed that the owner transported the barge to a Texas shipyard for the specific purpose of scrapping the structure. Upon arrival at the shipyard, however, the structure remained a "vessel", despite the owner's undisputed plans. The barge lost "vessel" status only when a contractor began the shipbreaking process and cut gaping holes in its bow. Although the barge could still float, the holes would lead a reasonable observer to conclude that the barge could no longer carry people or things over water. In reaching this conclusion, the Fifth Circuit focused not on the owner's intentions for the structure, but on the perception of the reasonable observer, based on the physical characteristics of the barge. In the same vein, the focus in the present matter remains on the reasonable observer's perception of the DPDS1, and not on Paragon's plans. And no evidence raises a fact issue as to whether that reasonable observer, viewing a drillship with people aboard, with some functional equipment, and with no significant physical defects other than normal wear and tear, would conclude anything other than that the DPDS1 was a structure capable of carrying people or things over water.

### III. Conclusion

The competent summary judgment evidence demonstrates that during the relevant time period, the DPDS1 was a "vessel" as defined in 1 U.S.C. § 3. As a result, the DPDS1 constitutes a vessel for purposes of the Limitation of Shipowners' Liability Act, 46 U.S.C. § 30505.

Signed on February 12, 2021.

_Fernando Rodriguez, Jr._
Fernando Rodriguez, Jr.
United States District Judge